# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

(No. 14135.—Reversed and remanded.)

THE NORTHERN ILLINOIS LIGHT AND TRACTION COMPANY,
Appellant, *vs.* THE COMMERCE COMMISSION *ex rel.* The
City of Ottawa, Appellee.

*Opinion filed February 22, 1922.*

1. PUBLIC UTILITIES—*Commerce Commission should make findings on material controverted issues.* On petition of a street railway company to discontinue its service on certain streets because the revenue from the entire system is not sufficient to pay a reasonable return on the investment, and that to require the company to aid in paving such streets, as required by its contract, means confiscation of its property, the Illinois Commerce Commission should make findings upon the material controverted issues, including the fair cash value of the entire property, what is considered a reasonable return on the investment, and whether such reasonable return will be realized if the company is compelled to operate its entire system and to make the required improvements.

2. SAME—*street railway company cannot be compelled to operate at a loss.* The obligation imposed by the franchise of a street railway company, which requires it to share in the cost of paving streets where it operates its cars, is legal and binding, but the company cannot be compelled to operate its system at a confiscatory

cost if such is the result of being required to aid in paving certain streets on which it asks to discontinue its service; and the question whether or not the company is making a profit in another utility is not to be considered.

3. SAME—*when street railway company cannot abandon part of service because it is operated at a loss.* Where a street railway company is receiving a sufficient return on its investment to make a reasonable profit on its entire system it cannot abandon any part of the system because it operates such portion at a loss.

APPEAL from the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding.

JAMES A. KNOWLTON, for appellant.

GEORGE V. B. WEEKS, for appellee.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

The Northern Illinois Light and Traction Company, appellant, on June 10, 1920, filed a petition before the Illinois Commerce Commission asking for leave to discontinue its street railway service on Norris and DeLeon streets, and on that portion of Columbus street north of the right of way of the Chicago, Rock Island and Pacific Railroad Company, in the city of Ottawa. The city of Ottawa answered the petition, setting forth various objections and facts upon which it based its claim that an order permitting appellant to discontinue such street railway service should be denied. After a hearing the commission entered an order permitting appellant to discontinue such railway service on Norris street but required it to continue operation of its street railway service upon the other two highways in the city and to thereafter maintain a regular schedule of not more than twenty minutes between cars on said two streets. On appeal to the circuit court of Sangamon county the order of the commission was affirmed by that court, and the traction company has prosecuted this appeal.

Appellant built its street railway system in Ottawa in 1888 or 1889. Since 1896 it has been in operation, including that portion of its system north of the Rock Island railroad crossing. The rails in the tracks north of the Rock Island crossing are fifty-pound rails and in bad condition, but the rest of the system in the city is in fairly good condition where sixty-pound rails are used, as we understand the record. The city of Ottawa in 1910 passed an ordinance giving appellant permission to operate its system on the streets of the city, and required it, after constructing its tracks, to restore the streets to their original condition, and when any street occupied by it was ordered to be paved by the city, the ordinance required appellant to pave its tracks between the rails and for one foot on each side thereof and to use the same kind of material that was used on the remainder of the street, or that it should be assessed and taxed for the cost of such excavating, grading and paving. In March, 1920, the city passed an ordinance for the paving with brick of Norris and DeLeon streets and that portion of Columbus street lying north of said railroad crossing. Appellant's track on Columbus street north of the railroad crossing is of the length of 1000.5 feet, or a distance of three blocks. It then runs west on DeLeon street a distance of 1177 feet, or three city blocks. Norris street crosses Columbus street about a block and a half north of the railroad crossing, and runs from Columbus street east a distance of 1950 feet to the Ottawa Driving Park Association, or fair grounds, and appellant's track is also laid in this street to the fair grounds and connects with Columbus street but does not cross it. For the paving of these three streets north of the railroad crossing appellant has been assessed $11,848 but the assessment has not yet been confirmed. Under this paving ordinance Columbus street north of the crossing is to have a parkway in the center through which appellant's track will run, and it is only assessed for paving street crossings north of the railroad, or

about 300 feet, but it is assessed its share for the entire paving on the other two streets so far as its track runs. It is the claim of the appellant that it has no money or funds with which to make the expenditures it will have to make if the streets in question are paved and it is required to continue its service on those streets, and that it will amount to confiscation of its property if it is required to make such new outlay of expenditures.

Appellant's system in Ottawa consists of two main lines,—one known as the South Ottawa line and the other as the Avenue line. The Avenue line extends from the plate glass works, on the west side of Ottawa, in an easterly direction to Columbus street, near the Fox river, in the eastern part of the city, and thence north on Columbus street to DeLeon street. The South Ottawa line extends from a point about six blocks south and one block west of the crossing of appellant's line of the Rock Island railroad, south on LaSalle street and across the Illinois river, and after crossing the river it branches into two lines, one running in a southeasterly direction and the other in a southwesterly direction for the accommodation of the people living south of the Illinois river in Ottawa. The south branch crosses the Avenue line, which runs in an easterly and westerly direction to Columbus street, at a point one block west of Columbus street. The total mileage of the system in Ottawa is practically six miles and no extensions have been built in recent years. Appellant has seven cars and regularly operates five,—three on the Avenue line and two on the South Ottawa line. The three cars on the Avenue line give a twenty-minute service south of the junction of Columbus and Norris streets, a one-hour service on Norris street to the fair grounds, and on DeLeon street the service is an alternate service of twenty and forty minutes. Two cars operate on the South Ottawa line, and appellant's interurban cars come in from Streator on the south side and run north to the business district of the

town, which is south of the Rock Island railroad and north of the Illinois river. Appellant gives a fifteen-minute service from Jackson street, in the business district, south on the South Ottawa line to the junction south of the Illinois river and a thirty-minute service from the junction on the two branches. Every car is operated by one man, every one of whom must be paid a full day's work every day in the week in order that appellant may retain them in its service. The evidence shows that there is no possible way, under appellant's present condition, of improving the net earnings of its system by giving additional service. The city of Ottawa has about 12,000 population, and the evidence shows that only from 1500 to 2500 of this population live north of the Rock Island crossing, and that there is very little more revenue received by appellant from its system north of the Rock Island railroad, if any, than the necessary expense of operating that part of the system.

Appellant made proof before the commission that if it were required to reproduce and replace anew its entire railway system in the city of Ottawa, and all the property belonging or pertaining thereto in the city, at the prices then prevailing, September, 1920, it would cost $344,745, and that if proper allowance be made for depreciation the present value of all its property in the city would on that basis of prices be $256,284. One witness for appellant estimated that the present value of all of appellant's property belonging to its system in Ottawa is $158,244, and he based this valuation upon the fact that the entire value of the property had been fixed in another case, in 1917, presumably by the commission itself, at $145,828, and that thereafter, in the year 1918, appellant spent $12,394.34 upon the plant, of which amount $7501 was for paving streets in Ottawa. The only way in which the city of Ottawa sought to meet this evidence of appellant as to the present value of the property was by proving that the tax schedule filed by the agent of appellant on April 21, 1919, listed the "steam en-

gines and boilers, franchises, merchandise, materials and manufactured articles, and all other personal property" of appellant inside the city, at the total valuation of $46,650 and that the board of review raised the assessment to the total sum of $65,000. The evidence of appellant was also to the effect that no part of the tracks now laid on the three streets north of the Rock Island railroad could be used or re-laid if it was required to pave its tracks on said streets, and that the improvement north of the railroad crossing would be a complete loss to appellant except the overhead structures, trolley wires, etc., if it was required to pave, as the salvage of the material taken up would no more than pay the expense of taking it up. The city introduced evidence to the effect that the same rails taken up might be re-laid and used by appellant by cutting off the ends of some rails that had been battered through use. The evidence of appellant was further to the effect that it would cost to remove its tracks on Columbus, Norris and DeLeon streets north of said crossing and to replace the same, including the paving of the streets for which it is to be assessed, the sum of $37,792.34. This estimate, however, is concededly too high, as in the estimate the paving is fixed at $15,272, whereas the actual amount of the paving to be assessed against appellant is only $11,848. This difference in the estimate occurred by reason of the fact that the portion of Columbus street north of the Rock Island crossing is to have a parkway in the center of the street, through which the railroad track is intended to run, and by reason thereof only the street crossings, or practically 300 feet of that portion, are to be paved instead of the entire 1177 feet. The estimate of appellant also included ninety-pound steel rails for this new improvement, while the evidence tends to show that sixty-pound rails would be all that is required, with which latter rails the paved streets south of the Rock Island crossing are laid. The commission made no finding upon this question, but it reasonably appears from the evi-

dence in the record that the cost to appellant of taking up all its rails north of the railroad track, (as it will have to do if those streets are paved and it is required to still operate on those streets,) will not be less than $20,000, including the $11,848 for paving, even if it can use the fifty-pound rails now there in the reconstruction, and not less than $25,000 if it is required to use new sixty-pound rails. The evidence further shows that the overhead structures and other structures in said two streets that will not have to be removed in the reconstruction are of the present value of $3000 or more, which means that appellant will have invested in its structures on said streets after the reconstruction, if it is made, from $23,000 to $28,000.

The total net earnings of appellant for the five years, 1915 to 1919, both inclusive, are $11,699.32, $11,112.98, $9932.99, $7754.79 and $9178.03, respectively. This net revenue was realized from the total fares collected from passengers, rent of tracks and privileges, less the expenses. The total number of passengers carried on the entire line of appellant in the city from December, 1919, to August, 1920, is 529,928. Of that number 270,359 were carried on the South Ottawa line and 259,569 were carried on the Avenue line. Of the last number 24,830 boarded the cars north of the Rock Island crossing, or less than five per cent of the total number of passengers carried by appellant for that time in the city. Appellant's trackage within the city north of the Rock Island crossing is about thirteen and one-half per cent of its total trackage within the city. Seven days of December, twelve days of May, and the months of June, July and August, were estimated in obtaining the above results for that time. For the remainder of the time the above is an exact showing. For the same eight months the total net earnings of appellant for its entire line in the city was $5840.54 and the total net earnings of its system north of the Rock Island crossing was $6.82, after apportioning the expenses to that part of the system according to

trackage. The record also shows that the total number of paid passengers carried on the entire system of appellant in the city for the months of December, 1919, to May 19, 1920, inclusive, was 371,766; that for the same time the number of paid passengers boarding cars north of the Rock Island track was 17,010; that the total number of paid passengers boarding or alighting on Norris street during the period was 7886; and that the number boarding or alighting on DeLeon street for the same period was 22,503,—an average of 51 daily passengers on Norris street and 137 on DeLeon street. Appellant estimates that its actual net earnings for the year ending December 31, 1920, were $9319.51. It makes the further estimate that if it had been allowed to abandon its system north of the Rock Island railroad it could have given a fifteen-minute service south of the railroad and have earned $9701.68, and that if it had given a twenty-minute service south of the railroad, as it now gives, and had been permitted to abandon its system north of the railroad, its net earnings for 1920 would have been increased $1000 or more over the actual earnings for 1920. All passenger fares are estimated in the above calculations at five cents per passenger, that being the highest fare that appellant is permitted to collect in the city. It now has an application before the commission for an increase of fare to seven cents, but the petition is still pending and undetermined.

Appellant made a strong showing before the commission to the effect that the thirteen and one-half per cent of its system in trackage north of the Rock Island crossing was bringing to it before it filed its petition in this case less than five per cent of its total revenue in passenger fares; that such revenue was only a pittance above the actual expenses of that part of its system; that if it be required to maintain its system on all three of the streets north of the crossing and the city paves those streets as above contemplated, it must, under the ordinance aforesaid and under the pres-

ent condition of its tracks, remove all of the tracks and re-
lay 'them with the rails now there or with new sixty-pound
rails, at an additional cost of from $20,000 to $25,000,
with little or no hope of adding very much to its revenues
in the way of additional fares collected on said streets and
without any reasonable expectation of then receiving any-
thing like a fair and reasonable return on its entire invest-
ment in the city from the net revenues collected both north
and south of the crossing. Its entire net return on all of
its investments in the city, taking the lowest estimate that
was placed upon the value of its property, $158,244, was
less than six per cent in both the years 1919 and 1920.
Appellant contends that it is entitled to eleven and one-
half per cent of net revenue for depreciation and return as
a reasonable return on its investment. The commission ap-
parently concedes that it is entitled to ten per cent net reve-
nue on the value of its investment, because in its order is
found this statement: "The commission has made no val-
uation of the property, but the net revenue as above given,
allowing ten per cent for depreciation and return, would
represent a valuation of $91,780." This statement was
made for the reason, as given by the commission, that the
net revenue of appellant for the year ending December 31,
1919, was $9178.03. The commission concedes, and it is
unquestioned by the city of Ottawa, that appellant will be
compelled to take up its tracks on the three streets in ques-
tion if the city paves. The evidence is undisputed that in
Norris and DeLeon streets the grades of the streets are in
such condition that they are quite a little higher outside the
tracks of the appellant, and that by reason thereof when it
rains the tracks on those streets resemble canals, and in cold
weather, when it freezes very hard, the tracks have some-
times been out of use for four or more days at a time
through the winter season. The commission by its order
has permitted the abandonment by the appellant of Norris
street but by the same order has required it to continue

on DeLeon street, where it will have to pay its portion of 1177 feet of paving, and on Columbus street, where it will be required to pay its portion of 300 feet of the proposed pavement.

An objection raised to the commission's order by appellant, and also by appellee, is, that in its order it has failed to find the necessary facts upon which its order is based so this court can determine the correctness of the order. This objection is well taken. There are very few of the controverted facts in the record upon which the commission makes a finding. It does find that the property of appellant on the streets north of the railroad crossing is in a badly depreciated condition and that if paving is done on those streets complete renewal will be necessary, and that continued operation will require an early renewal of the property there, regardless of the question of pavement. This finding is followed by the statement that incidental to the proposed paving the cost to petitioner is estimated at $11,848, and that the cost of track and overhead renewals is placed by the company at not less than $25,000. By this part of the order we understand that if paving is done the reconstruction will require new steel rails to be laid by appellant. It is also stated by the commission that appellant contends that the revenue from the operation of its system as a whole is not sufficient to pay a reasonable return on its investment. The commission does not answer this contention by either finding that the net return is sufficient, or what per cent of net earnings it considers to be a reasonable return for appellant on its investment. Both of these findings should have been made by the commission. The commission does not make any finding as to the fair cash value of the entire property of appellant, but simply recites in its order that the lowest estimate of value on the property is $158,244. It was particularly necessary, also, for the commission to make its finding as to the reasonable cash value of appellant's property.

Another controverted fact in the record is whether or not appellant made a correct showing as to how many passengers boarded appellant's cars for passage north of the Rock Island railroad from December, 1919, to May 19, 1920, inclusive, it being the contention of appellant that it had an exact account of such passengers, while the city claimed that the conductors did not give a correct account but collected near fifty per cent of fares for which they never made any account. Appellant's reply to this contention is that transfers for passengers and half fares for children were not rung up by the conductors, and that this probably accounted for the city's contention that such fares were not accounted for, when, as a matter of fact, they were accounted for by appellant at its office.

The commission recites in its order that the total length of the appellant's line on Norris street is approximately five city blocks, and that for a distance of three blocks from Columbus street Norris street is closely built up with residences and that beyond that the buildings are more scattering. It then finds that the majority of those who live contiguous to the Norris street line and who may use the infrequent and irregular service furnished on that line would have available car service on Columbus street, not further than three blocks from their homes, and that it is doubtful whether or not the amount of regular traffic obtainable on this line is sufficient to justify more frequent service. It then reaches the conclusion that the expense of renewing the property and paving on Norris street is an unreasonable burden to place permanently upon the appellant and the public. The order then recites that after considering all the facts and circumstances in the case the commission finds that the maintenance of service on Columbus and DeLeon streets will furnish reasonably adequate service to the public in that portion of the city and that the maintenance of the Norris street line is not necessary to furnish reasonably adequate service. The most important question to appel-

lant in this case is whether or not such service on DeLeon and Columbus streets can be furnished and appellant still realize a reasonable return upon all of its property after taking into consideration the return or net earnings it will receive in the operation of its entire system within the city, and also whether or not it will amount to a confiscation of its property if it is compelled to renew its entire system on Norris and DeLeon streets and pay its portion of the paving that will be assessed against it.

In the absence from this record of proper findings by the commission, as already indicated, it is not possible for this court to determine whether the order of the commission is sustained by the evidence. The commission seems to have proceeded upon the theory that it is the duty of appellant to furnish adequate service to the citizens of North Ottawa without regard to whether or not it can do so without suffering an actual loss each year of its existence, as it contends it will suffer if required to continue the service in question and assume the burden of the cost of the reconstruction of its road north of the Rock Island railroad. The evidence seems to us to justify appellant's conclusion that the small return on its outlay which it has received for years will be further reduced if compelled to pave the streets aforesaid and to re-build its line on those streets. This question might be viewed in a different light if the commission had omitted from its order the requirement that the service be continued on DeLeon street. The same reasoning that the commission followed in allowing an abandonment of service on Norris street seems to apply equally to DeLeon street, as about all the patrons who use the cars on DeLeon street would not be over five or six blocks away from the line on Columbus street. One of the reasons given for continued service on DeLeon street is, that quite a number of laborers living near that street use appellant's cars to ride to their work at the Federal

Plate Glass Works, which is a distance of about two and one-half miles from DeLeon street.

One of the main contentions of the city of Ottawa is, that under its franchise appellant is obligated to bear its just proportion of the cost of paving the streets in question, and that it should not be allowed to escape such obligation. This obligation is a legal and binding one, and appellant must pave between its tracks in streets where it operates its cars, but under the law it cannot be compelled to operate its system at a confiscatory cost. Another contention of appellee is that as appellant is also engaged in another department of its business,—the operation of an electric lighting system and generating power for sale in the city and along its interurban line,—in considering the question whether or not appellant is receiving a reasonable profit and return on its investment its profits from both branches of its service should be considered in determining whether or not it is receiving a reasonable profit in operating its street railway. Very little attention was given to that question, but it seems to be admitted by appellant that it is making a profit in its electric light and power plant.

In the case of *Mt. Carmel Utility Co.* v. *Public Utilities Com.* 297 Ill. 303, this court held that the State has no power to compel a public utility to serve the public without reasonable compensation, as legislation, in whatever form, by which the property of one is applied to the use of another or to the public without compensation is forbidden by section 2 of the bill of rights in our constitution and by the fourteenth amendment to the Federal constitution, but that a corporation may be required to fulfill an obligation imposed by its charter even though it may be done at a loss. It was also held in that case that where a public utility is engaged in furnishing to the public, through various departments of its business, different kinds of service, it cannot be compelled to carry on a branch of its business which furnishes one kind of such service at a loss although

at the same time its whole business may be conducted at a profit. The question whether or not appellant in this case is making a profit in its other utility is not proper for consideration in this case. On the question of abandonment, if appellant is receiving a sufficient return on its investment in its street railway service to make a reasonable profit on its entire outlay, then, under the constant holding of this and other courts, it could not abandon any part of its railway system in the city because it was operating such portion at a loss. As long as appellant continues to operate any part of its system in the streets of Ottawa its obligation to pave whenever the streets are paved on which its line is in operation is undoubtedly a binding one, but it cannot be required to continue the operation of its system and pave the streets where such continuous operation would amount to a confiscation of its property. A public utility is entitled to have a rate which will yield a fair return on the value of the property used by it for the public convenience, and not a rate which is confiscatory or which is merely non-confiscatory. The public is also entitled to demand that the rate be no more than a rate which will yield a fair return on the value of the property used by it. (*Public Utilities Com.* v. *Springfield Gas Co.* 291 Ill. 209.) The question in this case is not one of rate-making, but of the right to abandon a part of the utility on the ground that the operation of such part will amount to a confiscatory rate on the whole, or a rate upon the whole that yields such a small return that the owner of the utility would substantially suffer a loss if it were required to continue, or a rate that returns so small a profit that no reasonable business man would accept and continue such operation.

In the case of *Brooks-Scanlon Co.* v. *Railroad Com.* 40 Sup. Ct. 183, the facts were that the Brooks-Scanlon Company was operating a lumber business and a railroad business in connection with it, and it having been proved that the railroad could not be operated except at a loss, the

owner determined to abandon the same and to sell the rolling stock. The Supreme Court of Louisiana in passing upon whether or not the road could be abandoned, after saying that the two corporations were one under different names, stated that the only question left for determination was whether the plaintiff could be compelled by the commission to operate its railroad, and concluded that although the railroad showed a loss, the test of its rights was the net result of the whole enterprise, and on that ground held that it could not abandon its road. The Supreme Court of the United States reversed that decision, using this language: "We are of opinion that the test applied was wrong under the decisions of this court. A carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage. * * * It is true that if a railroad continues to exercise the power conferred upon it by a charter from a State, the State may require it to fulfill an obligation imposed by the charter even though fulfillment in that particular may cause a loss. But that special rule is far from throwing any doubt upon a general principle too well established to need further argument here. The plaintiff may be making money from its saw-mill and lumber business, but it no more can be compelled to spend that than it can be compelled to spend any other money to maintain a railroad for the benefit of others who do not care to pay for it. If the plaintiff be taken to have granted to the public an interest in the use of the railroad, it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss. The principle is illustrated by the many cases in which the constitutionality of a rate is shown to depend upon whether it yields to the parties concerned a fair return." In the case of *Bullock* v. *Florida*, 41 Sup. Ct. 193, in passing upon a similar question the court held that apart from statute or express contract, people putting their money into a railroad are not bound to go on with it at a loss if there is no reasonable prospect

of profitable operation in the future, and no implied contract to do so can be elicited from the acceptance of a charter or a grant of the power of eminent domain.

We are bound by the decisions of the Supreme Court of the United States when the due process clause of the fourteenth amendment to the Federal constitution is invoked by a litigant. We are of the opinion that the rights of the appellant demand a reversal of this judgment so that a reconsideration may be had by the commission of the issues in the case, and that upon a reconsideration thereof it is imperative that the commission should make findings upon the principal issues in this case, and particularly that there should be a finding of the value of the entire property of appellant in the city of Ottawa in accordance with the rules laid down by this court in the case of *Public Utilities Com.* v. *Springfield Gas Co. supra.* The commission should also find what is a reasonable rate for depreciation and return upon the present value of appellant's property, and whether or not it will realize such reasonable return, and should also find, if it holds that appellant should continue to operate its system on Columbus and DeLeon streets north of the Rock Island crossing, whether such operation will be confiscatory as herein defined.

We have not considered the question as to what effect the additional rate petitioned for by appellant may have upon the question involved, as no such rate has been determined and that matter is one to be first considered by the commission if any increased rate should be allowed.

The judgment of the circuit court is reversed and the cause is remanded to the circuit court, with directions to that court to set aside the order of the commission and remand the cause to the commission for a further hearing, and that both parties be permitted to introduce further evidence if they be so advised.

*Reversed and remanded, with directions.*