## STREATOR AQUEDUCT CO. v. SMITH, Chairman, et al.

### (District Court, S. D. Illinois, S. D. June Term, 1923.)

### No. 233.

1. **Public service commissions** ⬅➡7—**Preventing of unjust, unreasonable, and discriminatory rates held to be purpose of Illinois Public Utilities and Commerce Commission Acts.**

    The purpose of Illinois Public Utilities Commission Act and Illinois Commerce Commission Act is to maintain a general control over the operation of utilities in the state to the extent of preventing them from exacting from their patrons unjust, unreasonable, and discriminatory rates.

2. **Public service commissions** ⬅➡7—**Commerce Commission not empowered to suspend effective date of rate schedule for longer period than 10 months.**

    The Illinois Commerce Commission has no power to suspend the effective date of a schedule filed by a utility company under Public Utilities Commission Act, § 36, or Illinois Commerce Commission Act, § 36, for a longer period than 10 months, and when the 10 months expire without a finding that the rates of the proposed schedule were unjust and unreasonable that schedule becomes effective.

3. **Public service commissions** ⬅➡11—**Commission empowered to proceed with rate hearing, though proposed rates had been suspended for 10 months.**

    Under Public Utilities Act, § 36, and Illinois Commerce Commission Act, § 36, the commission has the power and the duty to proceed with a final determination of a hearing on a proposed schedule of rates, and determine whether the rates were unjust and unreasonable, and, if so, to determine what would be just and reasonable rates, though the proposed schedule has been suspended for 10 months.

4. **Public service commissions** ⬅➡7—**Privilege and duty of utility company to prescribe rates.**

    Under the Illinois Commerce Commission Act and its predecessor, the Public Utilities Act, it is the privilege and duty of a utility company to prescribe rates.

5. **Public service commissions** ⬅➡7—**Power of commission to alter rates depends on fact of reasonableness and compliance with statute.**

    The power of the Illinois Commerce Commission to alter rates made by a utility company depends on the fact of their reasonableness, and it can only act in accordance with the provisions of the statute conferring power upon it, on evidence justifying its action.

6. **Public service commissions** ⬅➡15—**No presumption that change in existing rate not rightfully made.**

    The act of changing an existing rate by a utility carries with it no presumption that the change was not rightfully made.

7. **Waters and water courses** ⬅➡203(10)—**Evidence held not to show confiscatory rate.**

    In a rate hearing on a schedule proposed by an aqueduct company, evidence *held* not to show that the rates proposed by the company were unjust or unreasonable, and to show that the rates proposed by the commission were confiscatory.

8. **Public service commissions** ⬅➡7—**Method of finding proper rate basis outlined.**

    To find a proper rate basis, the Illinois commerce commission must first find the present fair value of plaintiff's property and the reasonable cost of operation, and then find what would be a fair return for the use of the property.

---

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. **Public service commissions ☞7—In fixing rate, going value to be considered.**

The element of value in an assembled and established plant doing business and earning money over one not thus advanced is self-evident, and in fixing a rate this going value must be considered.

10. **Public service commissions ☞7—Cost of rate proceeding charged to operating expenses.**

The cost of a rate proceeding should be amortized over a period of years and charged to operating expenses.

11. **Public service commissions ☞7—Discount at which bonds are sold should be charged to operating expenses.**

In a rate proceeding, the discount at which bonds of the utility company are sold should be amortized during the life of the bonds and charged as operating expenses.

12. **Public service commissions ☞7—Deficits in operation to be amortized.**

In a rate proceeding, deficits in the operation of the property should be ascertained and amortized.

13. **Public service commissions ☞7—Commerce Commission Act held charter of commission and part of charter of utility company.**

The Illinois Commerce Commission Act is the charter of the commission, and is a part of the charter of every utility company operating or seeking to operate a franchise in Illinois, and becomes a limitation on powers of the regulatory body.

14. **Public service commissions ☞7—Commission prohibited from interfering with rates, unless they are unjust.**

While the Illinois Commerce Commission has the power to say that a utility company shall not collect rates which are unjust, unreasonable or discriminatory, it cannot interfere with the utility company in the collection of rates, unless they are unjust, unreasonable, or discriminatory, or compel the rendition of service for inadequate rates, especially in view of Const. U. S. Amend. 14.

In Equity. Suit by the Streator Aqueduct Company against Frank L. Smith, Chairman, and others. Judgment for plaintiff.

George B. Gillespie, of Springfield, Ill., for plaintiff.

Edward J. Brundage, Atty. Gen., of Illinois, and A. D. Rodenberg, Asst. Atty. Gen., of Illinois, both of Springfield, Ill., and Thurlow G. Essington, of Streator, Ill., for defendants.

FITZHENRY, District Judge. The Streator Aqueduct Company, plaintiff, filed a bill asking the aid of a court of equity to prevent the Illinois Commerce Commission from enforcing the provisions of an order passed by it on May 25, 1922, finding that plaintiff's schedule, filed under the provisions of the Illinois Public Utilities Act (Laws 1913, p. 459), and described as I. P. U. C. No. 2, did carry unjust and unreasonable rates, and ordering it to file a schedule in harmony with the provisions of the order; also, to prevent the Attorney General of Illinois from prosecuting the officers and agents of the plaintiff under the criminal provisions of the Illinois Public Utilities Act and the Illinois Commerce Commission Act of 1921 (Laws 1921, p. 702).

It appears that the plaintiff, as required by law, filed its schedule I. P. U. C. No. 2, February 19, 1920, and petitioned the commission for its approval of the schedule and for a permanent rate. On March 1, 1920, the Public Utilities Commission passed an order suspending the effective date, March 19, 1920, of the proposed schedule until June 19,

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

1920. Later, other orders of suspension were passed by the Public Utilities Commission and its successor, the Illinois Commerce Commission, at different times, purporting to suspend the entire schedule until the date of the filing of the order herein complained of by the plaintiff, to wit, May 25, 1922.

[1] In the passage of the Public Utilities Commission Act and its succeeding statute, the Illinois Commerce Commission Act, it was the purpose of the General Assembly of Illinois to maintain a general control over the operation of utilities in the state, to the extent of preventing them from exacting from their patrons unjust, unreasonable, and discriminatory rates. To this end certain general principles were laid down by the General Assembly, and the Public Utilities Commission and its successor, the Illinois Commerce Commission, were given liberal powers to carry into effect the principles of law announced by the General Assembly. The proceeding under consideration in this case was had by the two bodies. It was commenced under the Public Utilities Commission, and continued under the Illinois Commerce Commission after July 1, 1921; the Illinois Commerce Commission Act expressly providing that, as to proceedings commenced under the Public Utilities Commission Act, the Illinois Commerce Commission should proceed to hear and determine the questions raised in them the same as though the latter act had never been passed.

[2] Both acts require each public utility to file its schedule of rates and provide that the same shall become effective after 30 days. Section 36 of each act provides that when a schedule is filed the commission may, upon complaint, or on its own initiative without complaint, but upon notice, enter upon a hearing concerning the propriety of the rates sought to be made effective in the schedules filed, and provides that, pending the hearing, the rates shall not go into effect, after which the statute says:

"The period of suspension of such rate or other charge * * * shall not extend more than one hundred and twenty days beyond the time when such rate or other charge * * * would otherwise go into effect unless the commission, in its discretion, extends the period of suspension for a further period not exceeding six months."

The statute further provides that the rates not suspended shall become effective, and that as to those suspended and found to be unjust and unreasonable, and for which the commission provides substitutes, the latter shall become the effective rates. It is clear from the evidence in this case, and the record of the proceedings had before the commission, that the limitations contained in the statute were entirely disregarded, and the proceedings had the same as though no such limitation was contained in the law giving the commission its powers. The court feels that there can be no question as to the lack of power on the part of the commission to suspend the effective date of a schedule filed by a utility company for a longer period than 10 months. When the 10 months expired without a finding by the commission that the rates carried by I. P. U. C. No. 2 were unjust and unreasonable, then the schedule, by operation of law, became effective, and it was effective from and after the 19th day of January, 1921. Alton Water Co. v.

Illinois Commerce Commission (D. C.) 279 Fed. 869; Ill. Bell Tel. Co. v. Commerce Commission ex rel. et al., 304 Ill. 357, 136 N. E. 676. The commission proceeded to a final conclusion of the case, notwithstanding the fact that the period of suspension had lapsed.

[3] In the view that this court has taken of section 36, we feel it was the purpose of the Legislature to compel a final decision by the commission within the period of 11 months from the date of the filing of a proposed schedule. This view is apparently fortified by the generous provisions of the statute, which authorize the commission at any time, upon its own motion, to institute a proceeding or to consider a complaint as to the rates upon the initiative of some interested party. However, in Illinois Bell Tel. Co. v. Commerce Commission ex rel., supra, it is held that the limitation of 10 months upon the commission is simply as to the suspension of rates. In that case the Illinois Supreme Court said:

"This limitation of time, however, relates to the suspension of the rates, and does not relate to the power * * * of the Public Utilities Commission to hear and determine the reasonableness of the proposed rates. Regardless of whether the appellant might have put the new schedule of rates into effect at the end of the 10 months period, the duty remained with the commission to conclude its hearing and determine whether the proposed schedule of rates was just and reasonable, and, if not, then to determine what would be just and reasonable rates."

So it must be held that the commission not only had the power, but it was its duty to proceed with the final determination of the case, and determine whether or not the rates contained in I. P. U. C. No. 2 were just and reasonable, and, if not, then to determine what would be just and reasonable rates.

[4, 5] It is not only the privilege, but the duty, of a utility company under the Illinois Commerce Commission Act and its predecessor, the Public Utilities Act, to prescribe rates. This was the holding in the case of Ill. Bell Tel. Co. v. Commerce Commission, supra, and it is in harmony with the established law. Munn v. Ill., 94 U. S, 131; Turner v. Connecticut Co., 91 Conn. 692, 101 Atl. 88; Interst. Com. Com'n v. Ala. Mid. R. Co., 168 U. S. 144, 18 Sup. Ct. 45, 42 L. Ed. 414. The power of the Commission to alter rates made by the utility depends upon the fact of their reasonableness, and it can act only in accordance with the provisions of the statute conferring power upon it, upon evidence justifying its action, and in the absence of such evidence it has no authority to act. Interstate Commerce Commission v. Del. L. & W. Ry. Co., 216 U. S. 538, 30 Sup. 415, 54 L. Ed. 605; Interstate Commerce Commission v. L. & N. Ry., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431; Interstate Commerce Commission v. Stickney, 215 U. S. 98, 30 Sup. Ct. 66, 54 L. Ed. 112; People v. N. Y. C. R. R., 159 App. Div. 546, 145 N. Y. Supp. 513; Beale & Wyman on Railroad Rate Regulation, § 1035.

[6] The mere act of changing an existing rate by a utility carries with it no presumption that the change was not rightfully made. People v. N. Y. C. R. R., 159 App. Div. 546, 145 N. Y. Supp. 513; Interstate Commerce Commission v. Chicago Ry. Co., 209 U. S. 108, 28 Sup. Ct. 493, 52 L. Ed. 705.

[7] At the time of filing its proposed schedule with the Public Utilities Commission, there can be no question that the plaintiff was in the throes of a desperate financial emergency, and that is evidenced by the fact that, shortly after the first suspension of the effective rate of I. P. U. C. No. 2, the Commission, very largely as a matter of consent by the parties in interest, readily granted the plaintiff the privilege of filing a schedule carrying a 20 per cent. increase in its then existing rates without prejudice to its rights. The evidence shows that, even with the latter rates, the plaintiff was unable to sell its bonds to make needed improvements, and the effect of the emergency increase was merely to lessen the deficit of the company.

[8] In determining whether or not the rates carried by Schedule I. P. U. C. No. 2 were unjust and unreasonable, and, if so, to establish a just and reasonable rate, it was the duty of the commission to find a proper rate basis. In order to do this intelligently, fairly, and lawfully, it was the duty of the commission to first find the fair value of the property of the plaintiff and its reasonable cost of operation in the service of the public, and then to find what would be a fair return for the use of the property through its service by the commission. In either event the first important step required by law was for the commission· to ascertain the present fair value of plaintiff's property. This the commission eventually proceeded to do. Of course, the law required the commission to do this upon evidence justifying its action. To aid it in determining the present fair value of plaintiff's property, the testimony of three engineers was heard by the commission, two of whom were procured at the instance of the plaintiff, and who showed by their testimony that the present value of plaintiff's property was over $1,000,000. The other engineer made an estimate of the value of plaintiff's property, fixing it at $680,516. This engineer was one of the commission's staff. Upon the basis of his estimate, Prof. Bemis, an expert, offered some observations and conclusions.

The commission's engineer, in giving his estimate of the value, advised that it did not purport to be the present fair value of the plant, and said that, before he would want to give such a value, he would want to have in it all of the elements that the courts have said should be considered, among them, mentioned by him, were going value, additions for overhead in construction, particularly interest during construction, and a number of other items. In the light of this fact, the commission determined in some manner that the present fair value of plaintiff's property was $640,000. This conclusion was reached by the commission in the light of the testimony of the commission's engineer, and the fact that he said in his estimate he had not taken into consideration the going value of the property, which the other engineers, who were reputable, placed at $108,000, and that nothing had been allowed by him in his estimate for many of the things which the courts required to be considered in determining present fair value for rate making purposes. It is true that in its order of May 25, 1922, the commission found as follows:

"The fair value of the property of the Streator Aqueduct Company, used and useful in the rendition of water service, * * * including the physical

property, going value, materials, supplies, and working capital, is $640,000 as of November 1, 1921."

[9] The arbitrariness with which the commission in this case fixed the fair value of plaintiff's property is intensified, when this statement in the findings is considered in the light of the evidence; the commission's engineer having testified positively that the 1915–19 reproduction cost of plaintiff's property was $895,524, and depreciated 1915–19 reproduction cost was $688,516; that these estimates did not include the item of going value.

"That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return, when the same is privately owned, although dedicated to public use." Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 35 Sup. Ct. 811, 59 L. Ed. 1244.

When the commission's finding of fair value is considered in the light of the fact that it is some $48,000 less than the value placed upon it by its own engineer, with the statement that his estimate does not contain all of the elements to be considered, and with other engineers testifying that this important property right·has a value of $108,000, the mere statement of the commission that its finding includes that element is of no value. The going value is property which cannot be taken from it, except by due process of law, and it is such property as the plaintiff is entitled to the enjoyment thereof, and where it exists must be considered as one of the important elements in determining the reasonableness or the unreasonableness of a rate charged, or which it is proposed to charge.

In determining the items of income and cost of operation, two witnesses were called to prove that I. P. U. C. No. 2 would produce when applied to the business of the plaintiff. The commission's engineer estimated it would produce the sum of $123,948, estimated the operating expenses at $63,982, leaving a net amount available for depreciation, interest, and dividends of $59,966, from which should be deducted an annual depreciation of $8,235, leaving a balance of $51,731 available for return on investment. Yet the commission found that the annual operating expenses should be computed at $49,000, depreciation $8,500, and then found that the net income would be $58,448, or 9.1 per cent. upon the commission's estimated valuation of $640,000, and this in the light of the fact that the extreme amount shown by the evidence for a net return would be $51,731, considerably less than 8 per cent. on the commission's valuation of $640,000. If 10 per cent. be added to the commission's valuation for the going value, and this percentage was established by the evidence, the commission's valuation would then be carried to more than $700,000, to which should be added the working capital found by the commission to be necessary, $13,500, making a total of at least $713,500; 7 per cent. on that amount is $54,000, from which should be deducted the estimated return of I. P. U. C. No. 2, made by the commission's engineer, $51,731, leaving a balance of $2,-269 below a 7 per cent. return.

[10-12] An examination of the record discloses that the commission's engineer found the operating expenses for 1920 were $61,927.98, while plaintiff's bookkeeper testified that the figures for 1921 were $61,391.17, not including depreciation. Then the commission, in making its estimate of operating expenses, allows nothing for the amortization of bond issues or franchise expenses, and underestimated the taxes below the testimony, and found an amount for annual depreciation below an amount found necessary on a basis of its finding of a value of $640,000 at 1.5 per cent., which is the difference between $9,600 and $8,-000, or $1,600. The total of these items so cast amounted to $5,279.-82. The cost of the rate proceeding should be amortized over a period of years and charged to operating expenses. Springfield Gas & Electric Co. (Ill.) P. U. R. 1920A, 446. The discount at which bonds of the company are sold should be amortized during the life of the bonds and charged as operating expenses. United Pub. Ser. Co. (Ind.) P. U. R. 1920C, 666; In re United Rys. & Elec. Co. (Ind.) P. U. R. 1920A, 1; In re West Virginia W. & E. Co. (W. Va.) P. U. R. 1920D, 409; Whitton on Public Service Corporations, c. 13. There is conclusive evidence of deficits in the operation of the property. These should be ascertained and amortized. Columbus Gaslight Co. v. Public Service Com. (Ind. Sup.) 140 N. E. 538.

The outstanding bonds of the company aggregated $225,000; they were sold at 91 cents, $204,750; loss $20,250, to which should be added the expense of printing bonds, trustee's fees, commissions, attorney's fees, etc., $1,346.40; total, $21,596.40. It was estimated by the commission in its order of May 25, 1922, that the schedule authorized in lieu of I. P. U. C. No. 2 would produce a gross annual revenue of $103,-900. Assuming that to be true, and that its proposed rates would increase the plaintiff's income by $23,000, it would still be wholly insufficient to wipe out the deficit in operating expenses and to pay a sufficient sum to attract capital to the plaintiff for investment. The bookkeeper of the plaintiff applied the rates authorized by the order of May 25, 1922, to the business of the company, and found it would produce $3,553 less than the amount estimated by the commission in its order, $103,900. When this amount is deducted from the commission's estimate of income, and proper allowance made for amortization of bond discount, franchise expenses, erroneous finding as to taxes, and reduction of the amount allowed for annual depreciation below the depreciation reserve ordered on new construction, on rates heretofore allowed, makes a total of $8,832. When this amount is deducted from the commission's net return, estimated by it, upon its own rate of $38,400, a balance is left of $29,567.19, being a net return on the fair value of plaintiff's property, as found by the commission, of $640,-000, of but 4.62 per cent. So that it is apparent that the rates proposed by the commission are wholly inadequate.

The United States Supreme Court, in Lincoln Gas Co. v. City of Lincoln, 250 U. S. 267, 39 Sup. Ct. 457 (63 L. Ed. 968) in discussing the question of rates yielding as much as 6 per cent. on invested capital not being confiscatory, said:

"We cannot approve the finding that no rate yielding as much as 6 per cent. upon the invested capital could be regarded as confiscatory, in view of the

undisputed evidence, accepted by the master, that 8 per cent. was the lowest rate sought and generally obtained as a return upon capital invested in banking, merchandising, and other business in the vicinity; 7 per cent. being the 'legal rate' of interest in Nebraska. Complainant had not such a monopoly, nor were its profits 'virtually guaranteed' in such a sense as to permit the public authorities to restrict it to a return of 6 per cent. upon its invested capital. * * * It is a matter of common knowledge that, owing principally to the World War, the costs of labor and supplies of every kind have greatly advanced since the ordinance was adopted, and largely since this cause was last heard in the court below. And it is equally well known that annual returns upon capital and enterprise the world over have materially increased, so that what would have been a proper rate of return for capital invested in gas plants and similar public utilities a few years ago furnishes no safe criterion for the present or for the future."

There is an abundance of uncontradicted testimony to support the contention of the plaintiff that the present fair value of its property is more than $1,000,000. The only other evidence in the record from which any deduction might be made as to the present fair value of plaintiff's property is that of the commission's own engineer, who did not presume to give his judgment as to the present fair value of plaintiff's property, but simply gave an estimate of the original cost of certain articles in his inventory where the original cost could be obtained, and, where it could not, he used his own judgment, and had advised the commission that he did not presume to give any estimate of the present fair value of plaintiff's property. While the item of original cost may be considered where the circumstances and conditions and times bear some resemblance to those under consideration, yet, it is not and should not be controlling, unless they are identical, or substantially so. It is shown that many of the items of the commission's engineer were based upon figures prior to 1910, and some prior to 1900, and that the commission, in reaching the findings upon which it based its order of May 25, 1922, attempted to value the property without according any weight to the wholly enhanced cost of material, labor, supplies, etc., over those prevailing prior to 1914, when as a matter of common knowledge the increase was great.

In Willcox v. Consolidated Gas Co., 212 U. S. 19, 41–52, 29 Sup. Ct. 192, 195, 200 (53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034), the United States Supreme Court said:

"There must be a fair return upon the reasonable value of the property at the time it is being used for the public. * * * We concur with the court below in holding that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase."

In the Minnesota Rate Case (Simpson v. Shephard), 230 U. S. 352, 454, 33 Sup. Ct. 729, 762 (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), the United States Supreme Court said:

"The making of a just return for the use of the property involves the recognition of its fair value, if it be more than its cost. The property is held in private ownership, and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law."

The same proposition is reaffirmed in Denver v. Denver Union Water Co., 246 U. S. 187, 191, 38 Sup. Ct. 278, 62 L. Ed. 649; Newton v. Consolidated Gas Co., of N. Y., 258 U. S. 165, 42 Sup. Ct. 264, 66 L. Ed. 538, and Galveston Electric Co. v. City of Galveston, 258 U. S. 388, 42 Sup. Ct. 351, 66 L. Ed. 678. In Missouri ex rel. v. Public Service Commission of Missouri et al. (May 21, 1923), 262 U. S. 276, 43 Sup. Ct. 544, 67 L. Ed. 981, Mr. Justice McReynolds, of the United States Supreme Court, said:

"It is impossible to ascertain what will amount to a fair return upon properties devoted to public service without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made. An honest and intelligent forecast of probable future values made upon a view of all the relative circumstances, is essential. If the highly important element of present costs is wholly disregarded, such a forecast becomes impossible. Estimates for to-morrow cannot ignore prices of to-day."

In the same opinion the same justice said:

"It must never be forgotten that, while the state may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies, and is not clothed with the general power of management incident to ownership. The applicable general rule is well expressed in State Public Utilities Commission ex rel. Springfield v. Springfield Gas & Electric Co., 291 Ill. 209, 234: 'The commission is not the financial manager of the corporation and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers.'"

In the present case it is apparent that substantial elements of proof offered by the plaintiff in support of its claim that its rates evidenced by I. P. U. C. No. 2 are just and reasonable were wholly disregarded; that the commission arbitrarily placed a value of $640,000 upon plaintiff's property, in complete disregard of material, uncontradicted, and persuasive evidence; that, upon the basis of its own arbitrary estimate of the present fair value, a series of rates was ordered which would produce a questionable return of 6 per cent. Assuming that the commission was warranted in finding the present value of plaintiff's property as just stated, the most favorable thing that could be said of the rates so ordered under the circumstances would be that they are "merely nonconfiscatory," which is such a rate as the Illinois Supreme Court condemned in Northern Illinois Light & Traction Co. v. Commerce Commission, 302 Ill. 11–24, 134 N. E. 142. However, when the rates proposed in the commission's order are considered in the light of the undoubted present value of plaintiff's property, from $800,000 to $1,-000,000, it becomes clear that they are confiscatory.

[13, 14] The powers granted to the Illinois Commerce Commission by the statute of its creation are liberal and necessary. The act is the charter of the commission. It is more than that; it is a part of the charter of every utility company operating or seeking to operate a franchise in Illinois, and becomes a limitation upon the regulatory body. While the power is given to the commission to say that a utility company shall not collect rates which are unjust, unreasonable, or discriminatory, it at the same time prohibits the commission from interfering with the utility in the collection of rates, unless they are unjust, un-

reasonable, or discriminatory. It is not only the right, but the duty of the utility company to prescribe the rates for its service, and the effect of the statute is to make those rates effective, unless they violate the provisions of the law announced in the statute. When the commission acts, it must do so upon findings of fact based upon competent evidence. Unless it does so, its orders are ineffectual.

To permit the commission to nullify plaintiff's rates, as shown by I. P. U. C. No. 2, without competent and reliable evidence that they are unjust and unreasonable, would amount to a denial of the equal protection of the law guaranteed by the Fourteenth Amendment to the Constitution. To permit it to compel plaintiff to render service upon the basis of the proposed rates set out in the order of May 25, 1923, would amount to a taking of its property without due process of law.

Plaintiff is entitled to the relief prayed, and a decree may be prepared in harmony with these views.